Ernest DAGUE, Sr., Ernest Dague, Jr.,
and Betty Dague

v.

CITY OF BURLINGTON.

Civ. No. 85-269.

United States District Court,
D. Vermont.

Oct. 16, 1989.

William W. Pearson, Downs, Rachlin & Martin, Burlington, Vt., for plaintiff.

Michael B. Clapp, Dinse, Erdmann & Clapp, Burlington, Vt., for defendant.

## FINDINGS OF FACT, OPINION AND ORDER

BILLINGS, Chief Judge.

Plaintiffs bring this action against the City of Burlington ("City") for alleged violations of state and federal law arising out of the operation of the Burlington Municipal Disposal Grounds ("Landfill"). Plaintiffs allege that the operation of the Landfill has generally harmed the environment, and has specifically damaged their adjoining properties, by the generation of methane gas, wind-blown debris and hazardous waste. The ten-count complaint seeks injunctive relief, imposition of civil penalties, compensatory and punitive damages, costs and attorney's fees.

Trial by court was held during the period of May 8–11, 1989 on defendant's statutory liability, and plaintiffs' relief, if any, under Counts I through V of the complaint. These counts are brought pursuant to the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972 (Counts I–III); the citizen suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365 (Count IV); and the Vermont Groundwater Protection Law, 10 Vt.Stat.Ann. § 1410 (Count V). Liability under the remaining common law claims, Counts VI through X, and the issue of damages, will be tried by jury at a later date.

For purposes of this Opinion, we presume familiarity with prior Opinions, Orders, and Reports and Recommendations in this case.

## PROCEDURAL BACKGROUND

Plaintiffs filed their complaint in this matter on October 9, 1985. The case was initially referred to the Hon. Jerome J. Niedermeier, United States Magistrate for the District of Vermont, to hear and determine plaintiffs' motion for a preliminary injunction. Plaintiffs were seeking immediate closure of the Landfill. The Magistrate heard oral arguments on the motion for a preliminary injunction on October 28, 1985, at which time the City also moved to dismiss the complaint. Several more hearings were held between November 1985 and January 1986 on plaintiffs' motion for a preliminary injunction and the City's motion to dismiss.

In February of 1986, the Magistrate issued a Report and Recommendation finding, for the purpose of the motion for a preliminary injunction, that the City was in violation of RCRA, 42 U.S.C. § 6945(a), and the CWA, 33 U.S.C. § 1311(a). However, the Magistrate recommended that the Court deny plaintiffs' motion at that time and order the City to take certain specific steps toward remedying the violations. This Court adopted the Magistrate's Report and Recommendation *in toto*. Accordingly, we denied plaintiff's motion for a preliminary injunction and ordered the City, within sixty days, to make fully operational both a gas ventilation system and a leachate collection system for the Landfill. The City complied with the Court's Opinion and Order, dated March 26, 1986.

Early in this case, the City also filed third-party complaints against several other parties. The City subsequently attempted to join these third-party defendants as co-defendants. Meanwhile, the third-party defendants sought to dismiss the third-party complaints or, alternatively, to sever the third-party action from the primary case. On February 7, 1987 and September 3, 1987, respectively, the Court denied the City's motion to join defendants and granted the third-party defendants' motion to dismiss. The City sought, but was denied, certification from the Court to allow appeal of this decision as a final partial judgment.

On May 19, 1988, the Court granted the City's motion to separate the statutory claims for trial by court, from the common law claims and damages for trial by jury. Thereafter, cross motions for summary judgment and partial summary judgment, as well as motions on evidentiary matters, were heard and decided by the Court. By the spring of 1989, discovery was completed and the court claims were scheduled for trial.

At the close of the trial, on May 11, 1989, the Court allowed the parties until June 16, 1989 to file proposed findings of fact and conclusions of law. Plaintiffs filed memoranda in this regard on June 16, 1989; defendant filed its memoranda on June 19, 1989.

## FINDINGS OF FACT

Prior to the commencement of trial, plaintiffs filed a stipulation of facts, document # 204, a copy of which is attached as Appendix A. At trial, the parties agreed to incorporate the stipulations into the record, with a modification of Stipulation # 13. Accordingly, the Court incorporates herein the facts stipulated by the parties (hereinafter "Stipulations"), except that Stipulation # 13 now reads:

13. The Landfill is a highly saturated area.

In consideration of the evidence presented at trial, the exhibits and the parties' proposed findings, the Court adds the following facts:

The State of Vermont has authorization from the United States Environmental Protection Agency (EPA), pursuant to 42 U.S.C. § 6926, to operate its own solid and hazardous waste program; the State obtained various phases of interim authorization beginning in 1982, and received final authorization in January 1985. Under state statute, the legislature has delegated responsibility for the administration of Vermont's hazardous waste, solid waste and water control laws to the Secretary of the Agency of Natural Resources (formerly the Agency of Environmental Conservation).

The current Secretary, Jonathan Lash, has delegated some of this responsibility to the Commissioner of the Department of Environmental Conservation, but remains ultimately in charge of these programs.

The State takes the position that the Burlington Landfill is a solid waste landfill, not a hazardous waste storage or disposal facility. Accordingly, the State does not require the City to have a hazardous waste permit to operate the Landfill.

The January 31, 1985 Assurance of Discontinuance [1] was filed with the Chittenden Superior Court and was entered as an Order of that court on March 7, 1985. On December 18, 1985, the State of Vermont brought an action against the City in Chittenden Superior Court to enforce the March 7 Order. The State sought compliance with the provisions requiring the City to install a leachate collection system by September 1, 1985, and a methane control system by December 2, 1985. These systems did not become operational until March of 1986.

The January 31, 1985 assurance also imposed a closure option on the City—either choose another landfill site and close the Burlington Landfill by January 1, 1988, or begin operating a resource recovery facility (RRF) and close the Landfill by January 1, 1990.

The City never notified the State in writing of its choice of the two closure options, despite its obligation to do so in writing.[2] The City's Board of Aldermen did, however, adopt a resolution to pursue the RRF option. During the period from 1980 through early 1983, the City developed plans to construct a composting and recycling facility, with the State's cooperation and approval. As a result, the January 1990 closure date became effective. Subsequently, the Mayor of Burlington vetoed the aldermanic resolution electing the RRF option.

In addition to the various assurances of discontinuance and amendments thereto entered into by the City and the State, the

---

1. *See* Stipulation # 109.

2. *See* Stipulation # 116.

City also received Transitional Operational Authority (TOA) from the State to operate the Landfill. The State granted the City such authority by letter dated July 31, 1987.[3] The State has also performed its own environmental assessment of the Landfill.

Secretary Lash testified that the State conducted substantial monitoring and testing of the area in and around the Landfill, particularly the Intervale, during the years 1985 and 1986. The State collected both leachate data and biological data. As a result of its investigation, the State concluded that the Landfill did not, at that time, present an imminent and substantial endangerment to human health or the environment. However, the State also determined that January 1, 1990 was an appropriate closure date in view of the environmental concerns presented by the Landfill. According to Secretary Lash, the State still intends to enforce the January 1, 1990 closure date.

Craig Heindel, a hydrogeologist with the firm of Wagner, Heindel & Noyes, conducted studies of the surface water and groundwater flow regime in and around the Landfill. According to his studies, the flow of groundwater and surface water in the vicinity of the Landfill is horizontally from south to north. It is highly unlikely that any groundwater flows in a southerly direction beneath the Landfill.

The soils beneath the Landfill have very low permeability. There is a slight downward vertical flow beneath the Landfill, a downward flow under the railroad embank-

ment, and a strong upward flow immediately north of the embankment. As a result, the groundwater entering the Landfill from the south, and any groundwater originating in the Landfill, flows northward and discharges into the very upper layers of the cattail marsh, immediately north of the railroad embankment.

Heindel also studied the input of water into the Intervale from various sources, including the Landfill. On average, approximately 500,000 to 600,000 gallons of water enter the Intervale per day. Of this, an average of 1,000 gallons is groundwater from the Landfill. Other sources of water include precipitation, periodic flooding from the Winooski River, storm water discharges from the street drainage system and groundwater from Burlington's "north end," and rain water draining off the beltline highway which runs along side Intervale.

The tests conducted by the engineering firm of O'Brien & Gere revealed the presence of chemical contaminants in the groundwater and surface water north of the Landfill.[4] Data from the O'Brien & Gere Report (Plaintiffs' Exhibit 51), as well as data processed by the City of Burlington and the State of Vermont, were summarized by plaintiffs' expert, Frank Reed, and introduced into evidence at trial (Plaintiffs' Exhibit 84).

Except for one test well located approximately 1,500 feet north of the Landfill, the test wells around the Landfill have generally shown lead concentrations well below 50 parts per billion.[5] Although on isolated occasions lead concentrations at these wells

---

3. The letter from the State's Department of Environmental Conservation to the City of Burlington, granting transitional authorization for the operation of the Landfill pursuant to Act 78, states in pertinent part:

 Transitional Authorization is hereby granted City of Burlington for continued operation of Burlington Landfill in accord with the previously issued Assurance of Discontinuance by this Agency. Transitional Operation Authority will remain in force until a comprehensive review of the facility required by 10 V.S.A. Section 6605a has been completed and until a decision regarding recertification of the facility under new standards required by the Act has been made.

Act 78 of the 1987 Legislative Session requires comprehensive assessment of all disposal facilities in Vermont by July 1, 1990. Burlington Landfill has been placed on the higher priority assessment list, based on information in the Solid Waste Management Section files. Assessment of all disposal facilities on the high priority list as required by 10 V.S.A. Section 6605a will be completed prior to December 31, 1988.

4. *See* Stipulations # 28–# 32 and Plaintiffs' Exhibit 51.

5. Pursuant to 40 C.F.R. § 257.3–4(c)(2)(i) and Appendix I thereto, the maximum contaminant level of lead permitted by the EPA is 50 parts per billion.

have exceeded this level, the average concentrations of lead remain below. Similarly, the data derived from testing the leachate has shown lead concentrations ranging from less than 2 parts per billion in April 1986 to 14.7 parts per billion in June 1986. The last recorded data on the leachate, for tests done in November 1988, show a lead concentration of 5 parts per billion.

One groundwater test well located approximately 1,500 feet north of the Landfill (identified as well 84–4) showed increasing levels of lead since June 1987, reaching a level of 73 parts per billion in November 1988.

The leachate collection system installed by the City is approximately 90% effective. Leachate escaping the collection system moves into the groundwater and generally flows northward, emerging just beyond the railroad embankment. Most of this leachate discharges into the shallow groundwater or surface water in the Intervale, within approximately 100 to 300 feet north of the railroad embankment. Leachate from the Landfill is contaminated with hazardous pollutants. The fact that leachate from the Landfill is toxic to the fathead minnow, Daphnia (water flea)[6] demonstrates that the leachate can kill a vertebrate in the food chain.

## DISCUSSION
### Counts I and II

Plaintiffs' Counts I and II are brought pursuant to the citizen suit provision of RCRA, which provides in pertinent part:

... any person may commence a civil action on his own behalf—

... against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter;

. . . . .

42 U.S.C. § 6972(a)(1)(A).

Plaintiffs' Count I alleges violations of RCRA's permit and notification requirements, 42 U.S.C. §§ 6925(a) and 6930(a), Count II alleges violations of RCRA's prohibition on open dumping, 42 U.S.C. § 6945(a).

### 1. Permit and notification requirements under RCRA

Plaintiffs' Count I, brought pursuant to 42 U.S.C. § 6972(a)(1)(A), alleges violations of the permit and notification requirements set forth in 42 U.S.C. §§ 6925(a) and 6930(a). Subsection 6925(a) requires owners and operators of hazardous waste facilities, existing as of November 19, 1980, to obtain an operating permit from the EPA.[7] Similarly, § 6930(a) requires such owners and operators to file with the EPA or the State written notification of its hazardous waste activities.[8] It is undisputed that the

---

6. See Stipulation # 36 and # 37.

7. Subsection 6925(a) states:
 (a) Permit requirements
 Not later than eighteen months after October 21, 1976, the Administrator shall promulgate regulations requiring each person owning or operating an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste identified or listed under this subchapter to have a permit issued pursuant to this section. Such regulations shall take effect on the date provided in section 6930 of this title and upon and after such date the treatment, storage, or disposal of any such hazardous waste and the construction of any new facility for the treatment, storage, or disposal of any such hazard-

ous waste is prohibited except in accordance with such a permit.

8. Subsection 6930(a) states:
 (a) Preliminary notification
 Not later than ninety days after promulgation of regulations under section 6921 of this title identifying by its characteristics or listing any substance as hazardous waste subject to this subchapter, any person generating or transporting such substance or owning or operating a facility for treatment, storage, or disposal of such substance shall file with the Administrator (or with States having authorized hazardous waste permit programs under section 6926 of this title) a notification stating the location and general description of such activity and the identified or listed hazardous wastes handled by such person....

City never obtained a permit from the EPA, or filed a notification with the EPA or the State, in connection with its operation of the Landfill. As a threshold matter, however, we must determine whether and to what extent the City was bound by the requirements set forth in §§ 6925(a) and 6930(a).

RCRA allows states to obtain authorization from the EPA to administer their own programs for hazardous waste management. 42 U.S.C. § 6926(b). The EPA will authorize a state program if it meets the following criteria: (1) it is equivalent to the federal program under RCRA; (2) it is consistent with the federal program and other authorized state programs; and (3) it provides adequate enforcement of compliance with RCRA Subchapter III. *Id.* As we stated in our Opinion dated March 26, 1986, "the determination of consistency between the federal scheme and Vermont's authorized program is one for the EPA, not the courts, to make."

Pursuant to 42 U.S.C. § 6926(e), the EPA also has the power to withdraw its authorization of a state program if it follows certain procedures, including a public hearing on the matter. Plaintiffs contend that, pursuant to 42 U.S.C. § 6972(a)(1)(A), they may directly challenge the City's operation of the Landfill without first having to seek withdrawal of the State's EPA authorization. In other words, plaintiffs argue that § 6972(a)(1)(A) allows them to bring this action against the City for violating § 6925(a) and § 6930(a) regardless of whether the State has EPA authorization and regardless of whether they have sought withdrawal of the State's EPA authorization. We disagree.

■. Once a state has obtained EPA authorization, its hazardous waste program operates in lieu of RCRA's Subchapter on Hazardous Waste Management, 42 U.S.C. §§ 6921–6934. 40 C.F.R. § 271.3(b). As was recently stated in *Williamsburgh-Around-the-Bridge Block Association, et al. v. Jorling, et al.*, No. 89–CV–471, slip op. at 10, 1989 WL 98631 (N.D.N.Y. August 21, 1989), "[b]y their own terms, the hazardous waste regulations promulgated un-

der RCRA applicable to owners and operators do not apply in states with their own RCRA hazardous waste programs." The regulatory requirements under RCRA are superseded by state regulations in those states having EPA authorization. *See Thompson v. Thomas*, 680 F.Supp. 1, 3 (D.D.C.1987). Therefore, a plaintiff seeking to challenge the operation of a hazardous waste site in an EPA authorized state may bring an action under state law, not federal law, or may seek revocation of the EPA's authorization; a direct action to enforce the RCRA permit requirement under § 6925(a) is not available.

■ The State of Vermont has an EPA authorized hazardous waste program pursuant to 42 U.S.C. § 6926. The State obtained various phases of interim authorization beginning in 1982, and received final authorizations from the EPA in January of 1985. By granting Vermont final authorization, the EPA implicitly determined that Vermont's program was equivalent to the federal program, consistent with federal and state programs in other states, and adequate in its enforcement mechanisms.

■ The Vermont Agency of Natural Resources administers the state program, as authorized by the EPA. The state program operates in lieu of the federal program. The State does not require the City to obtain a federal permit under 42 U.S.C. § 6925(a), nor is such a requirement imposed under 42 U.S.C. § 6972(a)(1)(A). Plaintiffs, therefore, have failed to prove the City in violation of the permit requirements of 42 U.S.C. § 6925(a).

■ Similarly, the City has not violated the notification requirements of 42 U.S.C. § 6930(a). Pursuant to this subsection, any person, as of August 19, 1980, "... owning or operating a facility for treatment, storage, or disposal of [hazardous waste] shall file with the Administrator (or with States having authorized hazardous waste permit programs under section 6926 of this title) a notification stating the location and general description of such activity and the identified or listed hazardous

wastes handled by such person." 42 U.S.C. § 6930(a).

As noted earlier, the City has never filed notification with the EPA under § 6930(a). As indicated by the language of the statute, however, Vermont's authorization from the EPA for its hazardous waste program obviates the need for the City to file with the EPA pursuant 42 U.S.C. § 6930(a). Such notification, if required by the State, would have to be filed with the State, not the EPA. The State takes the position that the notification requirement in § 6930(a) does not apply to the City's pre-August 19, 1980 activities because the statute is prospective in nature. To the extent that plaintiffs dispute this position, they may seek recourse with the EPA, which has the power to revoke the State's authorization under 42 U.S.C. § 6926(e). In this action, however, we do not find the City in violation of the notification requirements of subsection 6930(a) because we think the federal provision is, in this instance, superseded by state law.

### 2. Prohibition on open dumping under RCRA

Plaintiffs bring Count II of the complaint pursuant to 42 U.S.C. § 6972(a)(1)(A) on grounds that the City has been engaging in open dumping of solid and hazardous waste, as prohibited under 42 U.S.C. § 6945(a) [9] and regulations set forth in Part 257 of title 40 of the Code of Federal Regulations. Sections 257.3–1 through

257.3–8 of C.F.R. title 40 contains certain criteria for classification of solid waste disposal facilities and practices; practices that fail to satisfy these criteria constitute open dumping, and violate 42 U.S.C. § 6945(a). 40 C.F.R. § 257.1(a)(2).

Specifically, plaintiffs allege the following three practices violate the open dumping provisions of RCRA: (a) the generation of methane gas in concentrations above the safety limit set forth at 40 C.F.R. § 257.3–8(a)(2); (b) the discharge of pollutants into waters of the United States in violation of the surface water criterion set forth at 40 C.F.R. § 257.3–3(a); and (c) the contamination of an underground drinking water source beyond the Landfill boundary in violation of 40 C.F.R. § 257.3–4(a).

### a. Generation of methane gas

Plaintiffs allege that in the past the Landfill generated methane gas in concentrations exceeding the safety criterion in 40 C.F.R. § 257.3–8(a)(2), in violation of 42 U.S.C. § 6945(a). It is undisputed that prior to December 27, 1985, test wells near the Landfill, including some on the plaintiffs' property, showed concentrations of methane gas exceeding the so-called "lower explosive limit" in force under RCRA for methane gas concentrations.[10]

In earlier proceedings on plaintiffs' motion for a preliminary injunction, the City disputed the fact that the Landfill caused the pre-December 27, 1985 occur-

---

**9.** Subsection 6945(a) states:

(a) Closing or upgrading of existing open dumps

Upon promulgation of criteria under section 6907(a)(3) of this title, any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section. The prohibition contained in the preceding sentence shall be enforceable under section 6972 of this title against persons engaged in the act of open dumping. For purposes of complying with section 6943(a)(2) and 6943(a)(3) of this title, each State plan shall contain a requirement that all existing disposal facilities or sites for solid waste in such State which are open dumps listed in the inventory under subsection

(b) of this section shall comply with such measures as may be promulgated by the Administrator to eliminate health hazards and minimize potential health hazards. Each such plan shall establish, for any entity which demonstrates that it has considered other public or private alternatives for solid waste management to comply with the prohibition on open dumping and is unable to utilize such alternatives to so comply, a timetable or schedule for compliance for such practice or disposal of solid waste which specifies a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with the prohibition on open dumping of solid waste within a reasonable time (not to exceed 5 years from the date of publication of criteria under section 6907(a)(3) of this title).

**10.** See Stipulations # 78–# 96.

rence of methane gas at the sites around the Landfill. However, we adopted the Magistrate's finding that such a causal connection did exist. We concluded, at that time, that the City was in violation of this open dumping prohibition. We again hold that until December 27, 1985, the Landfill was producing methane gas in concentrations exceeding the lower explosive limit of RCRA, in violation of the prohibition on open dumping practices under 42 U.S.C. § 6945(a).

Sometime in December 1985, the City began installing the gas ventilation system at the Landfill. On March 26, 1986 we ordered the City to make the system fully operational within sixty days. About that time, the system did become fully operational. Since then, the gas ventilation system installed by the City has substantially alleviated the methane gas problem caused by the Landfill. The monitoring test wells, which before December 27, 1985 showed concentrations of methane gas above RCRA's lower explosive limit, have since then consistently shown methane gas concentrations below the lower explosive limit.[11] Thus, we conclude that since December 27, 1985, the City has not violated 40 C.F.R. § 257.3–8(a)(2).

*b. Discharge of pollutants into waters of the United States*

■ This open dumping issue, raised pursuant to 40 C.F.R. § 257.3–3(a), is directly related to plaintiffs' Count IV claim that the City is discharging pollutants into water of the United States in violation of the National Pollutant Discharge Elimination System (NPDES) of the Clean Water Act (CWA), 33 U.S.C. §§ 1311 and 1342. Proof of such unauthorized discharging of pollutants, in violation of 33 U.S.C. §§ 1311 and 1342, *ipso facto* establishes a violation of the surface water criterion of RCRA, 40 C.F.R. § 257.3–3(a). *See O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 642, 655 (E.D.Pa.1981).

■ We incorporate herein our discussion of Count IV below. On the basis of our conclusion that the City is violating the CWA, 33 U.S.C. §§ 1311 and 1342, we hold that the City is engaging in the open dumping practice prohibited under 40 C.F.R. § 257.3–3(a), in violation of 42 U.S.C. § 6945(a).

*c. Contamination of an underground drinking water source*

■ Plaintiffs also contend that the Landfill is contaminating an underground drinking water source beyond the boundaries of the Landfill, in violation of 40 C.F.R. § 257.3–4(a). Specifically, plaintiffs allege that the Landfill is causing an occurrence of lead in concentrations that exceed the maximum levels permitted under RCRA. This is the third form of an open dumping practice alleged by plaintiffs.

Pursuant to 40 C.F.R. § 257.3–4(c)(2)(i) and Appendix I thereto, the maximum contaminant level of lead allowed by the EPA is 50 parts per billion. According to the data compilations provided by plaintiffs' expert, the concentration of lead found in the leachate, and all but one of the test wells north of the Landfill, remained generally below this limit.

One test well located approximately 1,500 feet to the north of the Landfill (identified as well 84–4) did show significantly higher levels of lead in the groundwater, reaching a level of 73 parts per billion in November 1988. While this level clearly exceeds the federal limit of 50 parts per billion, there are many other potential sources of contaminants that may have contributed to the amount of lead detected at well 84–4. The test data shows that several wells located in the area between the Landfill and site 84–4 revealed much lower concentrations of lead than well 84–4. The evidence also indicates that leachate from the Landfill discharges into the surface water or groundwater within 100 to 300 feet north of the railroad embankment, and migrates northward at a very slow rate, if at all. Plaintiffs have not provided any direct evidence to show that the Landfill has caused the occurrence of lead at well 84–4.

---

**11.** *See* Stipulation # 96.

Thus, there is insufficient evidence to find that the Landfill is the sole or primary source of lead occurring at well 84–4. Accordingly, we hold that plaintiffs have not met their burden of proof on their claim of open dumping in violation of 40 C.F.R. § 257.3–4(a).

### Count III

Plaintiffs bring Count III of the complaint on grounds that the City, as an owner and operator of a disposal facility, has contributed in the past, and is contributing at present, to the storage, treatment or disposal of solid or hazardous wastes which may present an imminent and substantial endangerment to the public's health and the environment. Upon determining that such an endangerment exists, the Court is authorized to order such action by the City as may be necessary to abate the endangerment. 42 U.S.C. § 6972(a)(1)(B).[12]

We considered this claim in connection with plaintiffs' earlier motion for a preliminary injunction, which we decided March 26, 1986. At that time we agreed with the Magistrate's conclusion that the evidence was insufficient to support a finding that the Landfill may present an imminent and substantial endangerment to health or the environment. Our decision was based upon the conflicting nature of the opinions presented by plaintiffs' expert, Frank Reed, and the defendant's expert, William Countryman.

Both Dr. Reed and Mr. Countryman have advanced degrees in fields related to environmental studies; they have taught at academic institutions and have engaged in private environmental consulting. Both were qualified as experts and testified at trial.

Dr. Reed has a master's degree in biology and a Ph.D. in ecology. He testified at trial that his opinion was based on, among other things: site visits in 1985 and in April and May of 1989; studies of the Landfill including the O'Brien & Gere report and the Wagner, Heindel & Noyes study; data compiled by the City and State from water samples taken in and around the Burlington Landfill; the 167 stipulated facts in this case; and various state, federal and international regulatory standards including EPA groundwater and human health standards.

Dr. Reed visited the Landfill on several occasions in 1985 and 1989, in connection with this lawsuit. Some of the visual characteristics that he looked for in conducting his site visits included evidence of seeps, differences in the quality and quantity of vegetation present on the north and south sides of the railroad embankment, visual signs of stress on the vegetation and signs of animal activity.

Dr. Reed noted in testimony, however, that looking for visual signs of stress alone may be insufficient to assess the possible endangerment to a particular ecological system. Where, as in the case of a cattail marsh, the climax system has a high tolerance for toxic chemicals, it may only show signs of stress at a latent stage of deterioration. Dr. Reed testified, "[t]he visual deterioration of those kinds of systems occurs quickly, and it's long past the point at which you can begin to think of saving the system." Accordingly, his opinion was also based upon analysis of chemical data derived from the groundwater and surface water in and around the Landfill, and tests of the leachate.

Dr. Reed's opinion is that "the Burlington Landfill definitely presents an imminent and substantial endangerment to the

---

**12.** Subsection 6972(a)(1)(B) states:

(a) In general
Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

. . . . .

[ (1) ](B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; . . .

environment." His opinion at trial differed from his earlier opinion given in connection with plaintiffs' motion for a preliminary injunction. At that time, Dr. Reed testified that the Landfill "may" present an imminent and substantial endangerment to the environment.

Mr. Countryman, who has a master's degree in zoology, also conducted site visits in connection with this lawsuit and, in the 1970s, did some unrelated work at the Landfill. The bases of his opinion included: his observations at the Landfill, the stipulation of facts, general discussions with City officials, testimony presented at the preliminary injunction hearing and information he had concerning the concentrations of various contaminants in the water. In his opinion, the Landfill does not present an imminent or substantial endangerment to health or the environment.

While we do not question Mr. Countryman's expertise in this field, we note that he testified that he would want to see "evidence of stress" before rendering an opinion as to whether there was an imminent and substantial endangerment to the environment. In other words, defendant's expert would require some form of actual harm before determining that there may be an imminent and substantial endangerment to the environment. However, we hold that a finding of imminent and substantial endangerment does not require actual harm. *See United States v. Vertac Chemical Corp.*, 489 F.Supp. 870, 885 (E.D.Ark. 1980). Because the standard applied by defendant's expert was more stringent than is legally required, we think his opinion is not persuasive in this instance.

Even though the leachate collection system is approximately 90% effective, hazardous wastes are still being discharged into the soil, groundwater and surface water in and around the Landfill. Leachate escaping from the Landfill contains chemicals and compounds found on toxic and hazardous lists under RCRA and the CWA.[13] The testimony by Secretary Lash also revealed that the State concluded that January 1, 1990 would be an appropriate closing date in view of the State's independent environmental investigation in and around the Landfill. On the basis of these facts and other evidence in this case such as Dr. Reed's expert opinion, we find that the Landfill is now in violation of 42 U.S.C. § 6972(a)(1)(B), as it may present an imminent and substantial endangerment to health or the environment.

### Count IV

Count IV of the complaint is brought pursuant to the Clean Water Act (CWA), 33 U.S.C. §§ 1251–1387. The CWA provides for citizen suits against those who violate the Act's effluent standards or limitations. 33 U.S.C. § 1365(a)(1).[14] Plaintiffs specifically allege the City's operation of the Landfill violates the limitation set forth in 33 U.S.C. § 1311(a), which prohibits "the discharge of any pollutant by any person," unless authorized under the CWA. Such authorization would exist if defendant had obtained a permit for the discharge of pollutants, consistent with the requirements of 33 U.S.C. § 1342. The City has no such permit.

Almost all of the requirements of a subsection 1311(a) violation are evident in the facts, without substantial dispute. The term "discharge of a pollutant" includes the addition of any pollutant or combination of pollutants to waters of the United States from any point source. 33 U.S.C. §§ 1362(12) and 1362(7); 40 C.F.R. § 122.2. "Pollutant" is defined to include, among other things, "chemical wastes." 33 U.S.C. § 1362(6). Water samples taken in and

---

**13.** *See* Stipulations # 29–# 33.

**14.** Subsection 1365(a)(1) states:

(a) Authorization; jurisdiction

Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, ...

around the Landfill indicate the presence of various chemical wastes specifically listed as toxic pollutants under 40 C.F.R. § 401.15.[15] The area adjacent to and north of the Landfill, known as the Intervale, is a wetland and constitutes "waters of the United States" as that term is broadly defined under 40 C.F.R. § 122.2. Finally, since the City has not received a permit from either the EPA or the State of Vermont, the City is not authorized to discharge pollutants into the Intervale under the CWA, 33 U.S.C. § 1342.

The last remaining question raised by plaintiffs' CWA claim is whether or not the City has been discharging pollutants into waters of the United States "from any point source." "Point source" refers to: ". . . any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged . . . [but] does not include return flows from irrigated agriculture." 33 U.S.C. § 1362(14); 40 C.F.R. § 122.2. The term "point source" is to be broadly interpreted. As stated by the Tenth Circuit:

The touchstone of the regulatory scheme is that those needing to use the waters for waste distribution must seek and obtain a permit to discharge that waste, with the quantity and quality of the discharge regulated. The concept of a point source was designed to further this scheme by embracing *the broadest possible definition of any identifiable conveyance* from which pollutants might enter the waters of the United States.

*United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir.1979) (emphasis added).

The culvert, through which water flows from the Landfill into the Intervale, may accurately be characterized as a "discernible, confined and discrete conveyance," and as such it is a "point source." It is irrelevant that the City does not own

the land on which the culvert is located, as the statute broadly proscribes discharge from *any* point source. *See United States v. Velsicol*, 438 F.Supp. 945, 947 (W.D. Tenn.1976). For the reasons stated, we hold that the City's operation of the Landfill, without a permit issued pursuant to 33 U.S.C. § 1342, violates the Clean Water Act, 33 U.S.C. § 1311(a).

### Count V

Count V of plaintiffs' complaint is brought pursuant to the Vermont Groundwater Protection Law, 10 Vt.Stat. Ann. § 1410(c), for equitable relief from alleged unreasonable harm caused by the City in altering the character and quality of the groundwater beneath and around the Landfill.

The Vermont Groundwater Protection Law reads as follows:

§ 1410. Groundwater; right of action

(a) Findings and policy. The general assembly hereby finds and declares that:

(1) surface and subsurface water are inherently interrelated in both quality and quantity;

(2) groundwater hydrology is a science that allows groundwater quality and quantity to be mapped and forecast;

(3) groundwater is a mobile resource that is necessarily shared among all users;

(4) all persons have a right to the beneficial use and enjoyment of groundwater free from unreasonable interference by other persons; and

(5) it is the policy of the state that the common-law doctrine of absolute ownership of groundwater is hereby abolished.

(b) Definitions.

(1) "Groundwater" means water below the land surface.

(2) "Surface water" means any water on the land surface.

(3) "Person" means any individual, partnership, company, corporation, association, unincorporated association, joint venture, trust, municipality, the state of Vermont, or any agency, department or

---

**15.** *See* Stipulations # 29–# 33.

subdivision of the state, federal agency, or any other legal or commercial entity.

(c) Any person may maintain under this section an action for equitable relief or an action in tort to recover damages, or both, for the unreasonable harm caused by another person withdrawing, diverting or altering the character or quality of groundwater.

(d) Notwithstanding the provisions of subsection (c) of this section, a person who alters groundwater quality or character as a result of agricultural or silvicultural activities, or other activities regulated by the commissioner of the department of agriculture, shall be liable only if the alteration was either negligent, reckless or intentional.

(e) Factors to be considered in determining the unreasonableness of any harm referred to in subsection (c), above, shall include, but need not be limited to, the following:

(1) the purpose of the respective uses or activities affected;

(2) the economic, social and environmental value of the respective uses, including protection of public health;

(3) the nature and extent of the harm caused, if any;

(4) the practicality of avoiding the harm, if any:

(5) the practicality of adjusting the quantity or quality of water used or affected and the method of use by each party;

(6) the maintenance or improvement of groundwater and surface water quality;

(7) the protection of existing values of land, investments, enterprises and productive uses;

(8) the burden and fairness of requiring a person who causes harm to bear the loss; and

(9) the burden and fairness of requiring a person to bear the loss, who causes harm in the conduct of reasonable agricultural activities, utilizing good agricultural practices conducted in conformity with federal, state and local laws and regulations.

(f) Nothing in this section shall be construed to preclude or supplant any other statutory or common-law remedies.

10 Vt.Stat.Ann. § 1410.

In view of our findings, we conclude that leachate, which contains hazardous chemicals and is toxic to some forms of aquatic life, continues to flow into groundwater beneath and north of the Landfill. This contamination constitutes an alteration of the character and quality of the groundwater, and in consideration of the nine factors set forth above, unreasonably harms the beneficial use and enjoyment of the groundwater by other persons. Therefore, we hold that the City has been operating the Landfill in violation of 10 Vt.Stat.Ann. § 1410.

Pursuant to § 1410(c), "any person" may maintain an action for equitable relief from a violation of this statute. Plaintiffs, therefore, have standing to pursue this claim. Plaintiffs are entitled to equitable relief as provided below. They are further entitled to pursue their claims in tort, and to seek damages in a later trial by jury.

## CONCLUSION

For the foregoing reasons, the Court concludes the following:

1. Defendant City of Burlington has not violated 42 U.S.C. § 6925(a) or 42 U.S.C. § 6930(a) as alleged in Count I of plaintiffs' complaint.

2. As to plaintiffs' Count II, alleging three separate open dumping practices in violation of 42 U.S.C. § 6945(a): (a) the City was generating methane gas, in violation of 40 C.F.R. § 257.3–8(a)(2), but abated that practice on or about December 27, 1985, and since then has not violated this provision; (b) the City continues to discharge pollutants into water of the United States without a permit, in violation of 40 C.F.R. § 257.3–3(a); and (c) the City has not contaminated an underground drinking water source beyond the Landfill boundary, in violation of 40 C.F.R. § 257.3–4(a).

3. The Landfill may present an imminent and substantial endangerment to health or the environment, and therefore

its continued operation violates 42 U.S.C. § 6972(a)(1)(B), as alleged in Count III of plaintiffs' complaint.

4. The City is violating the Clean Water Act, 33 U.S.C. § 1311 by discharging pollutants into the Intervale without authorization, as alleged in Count IV of plaintiffs' complaint.

5. The City is violating Vermont's Groundwater Protection Law, 10 Vt.Stat. Ann. § 1410, by altering the character and quality of the groundwater beneath and north of the Landfill, as alleged in Count V of plaintiffs' complaint.

 In view of the statutory violations found, and pursuant to the Court's enforcement powers under 42 U.S.C. § 6972(a)(1), 33 U.S.C. § 1365(a) and 10 Vt. Stat.Ann. § 1410(c), the City is hereby ordered to close the Landfill on or before January 1, 1990. Civil penalties shall not be imposed pursuant to 42 U.S.C. § 6928(g) or 33 U.S.C. § 1319(d). Having determined that plaintiffs have substantially prevailed in both their RCRA amd CWA claims, the Court orders defendant to pay the costs of litigation, including reasonable attorney and expert witness fees, to be assessed. 42 U.S.C. § 6972(e); 33 U.S.C. § 1365(d).

SO ORDERED.

APPENDIX A

STIPULATION OF FACTS

Filed May 3, 1989

1. Plaintiffs are owners of residential property located on Manhattan Drive overlooking and contiguous to the Burlington Municipal Disposal Grounds ("Landfill").

2. Defendant, City of Burlington, Vermont ("City"), has owned and operated the Landfill since at least 1961.

3. The Landfill is located on approximately eleven acres of land to the north of the commercial-residential center of the City.

4. The Landfill is rectangular in shape and is bordered to the north by a portion of the railroad embankment of the Central Vermont Railway, and to the east and south by the properties located along Manhattan Drive.

5. The Landfill is contiguous to the plaintiffs' and their neighbors' properties, along which runs a steep embankment.

6. The Landfill slopes down another fifty feet or so into what is commonly known as the Intervale.

7. The Landfill is adjacent to the Intervale.

8. Future development in the Intervale is zoned in part for recreation, conservation and open space.

9. The Intervale is in the flood plain of the Winooski River.

10. The Winooski River is located approximately 3,000 feet east of the Landfill site and Lake Champlain is located approximately 2,600 feet to the southeast.

11. The Intervale has, on occasion, been flooded leaving the entire area covered with surface water, including parts of the Landfill itself.

12. The area adjacent to and north of the Landfill is a wetland, to wit: it is inundated or saturated by surface water at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions, i.e., a cattail marsh.

13. Before the Landfill commenced operating, the location of the Landfill was a wetland itself. The Landfill is a highly saturated area.

14. The cattail marsh and Intervale are highly saturated areas.

15. The Landfill is underlain primarily by silts and silty fine sands.

16. The Intervale just north of the Landfill consists mostly of peat underlain by silty fine sands.

17. Groundwater flows generally from south to north and northwest through and beneath the Landfill.

18. Trash is buried in the Landfill at a depth of approximately nine feet above the groundwater table on the southern edge of the Landfill, and at a depth of approximate-

ly nine feet below the groundwater table on the northern edge of the Landfill.

19. Groundwater mixes with and flows through contaminants in the Landfill.

20. Leachate is liquid that has passed through or emerged from solid waste and contains soluble, suspended or miscible materials removed from such wastes.

21. Leachate migrating downward through the trash joins through-flowing groundwater in a northerly direction into the Intervale where flow is generally upward.

22. As early as April, 1972, the City was aware that the landfill generated leachate.

23. In or about July, 1984, the generation of leachate by percolation of precipitation into the Landfill mass is estimated to be an average of four million (4,000,000) gallons per year, or an average of 11,000 gallons per day ("GPD").

24. In or about July, 1984, on the average, maximum percolation is estimated to be 32,000 GPD, and could rise to as much as 50,000 GPD during a severely wet month.

25. In or about July, 1984, the generation of leachate by groundwater (which flows through the refuse in the Landfill) is estimated to be approximately 1,000 GPD, and could be two to four times higher.

26. The leachate generated by through-flowing groundwater and percolation through the trash flows northward through and/or beneath the railroad embankment.

27. Most of any leachate which migrates beyond the Landfill boundary reaches the surface of the Intervale within 200 to 300 feet north of the railroad embankment.

28. In June, 1984, as part of a contract with the City, the engineering firm of O'Brien and Gere installed tests wells in and around the Landfill.

29. All of the test wells north of the railroad embankment contain contaminants.

30. Leachate from the Landfill contains chemicals and compounds found on toxic and hazardous lists under RCRA and the CWA.

31. Results of analyses of sampled surface water around the Landfill indicate the presence of, among other chemicals, 1, 1 dichloroethane, 1, 2 dichloroethane, carbon tetrachloride, benzene, xylene, halogenated organic compounds, tetrahydrofuran, nickel, cyanide, phenols, and 1, 1, 1 trichloroethane.

32. Results of analyses of sampled groundwater from monitoring wells around the Landfill indicate the presence of, among other chemicals, halogenated compounds, lead, tetrahydrofuran, nickel, cyanide, bis (2–ethylhexyl) phthalate, phenols, 1, 2 dichloroethane, pentachlorophenal, endosulfan sulfate, and nitrates.

33. 40 C.F.R. § 401.15 lists the "toxic pollutants" designated by the Administrator of the United States Environmental Protection Agency pursuant to 33 U.S.C. § 1317(a). The Administrator has designated those pollutants whose nature and extent of toxic effect warrant inclusion on the list and consequent limitation of release to the environment. Water test results from sampling in and around the Landfill show the presence of the following toxic pollutants listed under 40 C.F.R. § 401.15: carbon tetrachloride, benzene, lead, toluene, cyanide, phenol, pentachlorophenol, endosulfan sulfate, 1, 1 dichloroethane, 1, 2 dichloroethane, and 1, 1, 1 trichloroethane.

34. Groundwater in the acquifer beneath and around the Landfill contains less than 10,000 mg/1 total dissolved solids.

35. Well 84–2A is located near the northern edge of the Landfill.

36. Leachate from the Landfill was evaluated for toxicity to freshwater aquatic life, using standard bioassay techniques.

37. Leachate from the Landfill is toxic to the fathead minnow, Daphnia (water flea) and algae.

38. The majority of any leachate which escapes the leachate collection system enters directly directly into the shallow groundwater.

39. A culvert is "a transverse drain or waterway (as under a road, railroad, or canal)." (*Webster's Third New International Dictionary*, 553 (3d ed. 1981).

40. The City installed a leachate collection system, which is designed to prevent up to 90 percent of the leachate from leaving the Landfill.

41. The leachate collection system was designed and installed for the purpose of mitigating leachate migration problems at the Landfill.

42. Since the pump station associated with the City's leachate collection system started operating until October 3, 1986, the amount of leachate from the Landfill pumped to the City's main sewage treatment plant was estimated to be approximately 6,161,000 gallons. This estimation was based on the hours of operation for each pump, the average pumping rate, and an estimation that the pumps pumped simultaneously for 50% of the time.

43. Leachate from the Landfill collected in a perimeter ditch from mid-December 1985 until the pump station associated with the City's leachate collection system became operable. Any leachate that was collected in this ditch was pumped back into the Landfill.

44. Between 1950 and 1979, the General Electric Company disposed of approximately 200,000 gallons of liquid containing the following hazardous wastes in drums into the Landfill:

a. trichloroethylene, a spent halogenated solvent used in degreasing;

b. paint solvents and lubricating oils;

c. plating or paint sludge solids containing cadmium;

d. acid plating solids containing chromium;

e. paint sludge solids containing lead;

f. electroplating sludge solids containing sulfuric acid;

g. plating sludge solids containing chromium.

45. Between 1976 and December, 1980, the E.B. & A.C. Whiting Company disposed of approximately 20 pounds per month of degreasing solvent-soaked rags and approximately 300 pounds per month of heat-treating salt containing lead, barium, cadmium, chromium, arsenic, and mercury into the Landfill.

46. As of January, 1978, the G.S. Blodgett Company, Inc. disposed of approximately 10 gallons per week of kerosene, 5 gallons per week of lacquer thinner, 25 gallons per week of washing solvent containing trichloroethylene, and 15 gallons per week of toluene into the Landfill.

47. In 1978, the Edlund Company terminated its practice of disposing of approximately 264 pounds per year of sodium cyanide into the Landfill.

48. In June, 1982, the Hagar Hardware & Paint Company notified the Vermont Agency of Environmental Conservation that it disposed of approximately 85 gallons per year of a degreaser containing petroleum distillates (kerosene), 0–dichlorobenzene, (chlorinated) phenols, and potassium hydroxide, 350 gallons per year of a cleaning power containing sodium hydroxide and phenol, and 36 gallons per year of grease and oil sludge into the Landfill.

49. Up until May 12, 1982, Hagar Hardware & Paint Company's practice was to take the grease and oil sludge generated at its machine shop to the Landfill in five-gallon buckets.

50. At the Landfill, an employee of Hagar Hardware & Paint Company would pour the grease and oil sludge out of the bucket (or pail) and into the Landfill, and then return to the Company with the bucket.

51. By letter dated July 27, 1982, the State of Vermont Agency of Environmental Conservation informed the Hagar Hardware & Paint Company that it did not qualify for small quantity generator exemption but, rather, was classified as a large quantity generator of hazardous waste.

52. Copies of the July 27, 1982 letter were sent to Steven Goodkind and James Ogden.

53. No employee of the City ever contacted Hagar Hardware & Paint Company

with respect to the disposal of its grease and oil sludge in the Landfill.

54. In July, 1984, the City's Water Resources Department placed between 8 and 11 135–pound drums of anhydrous ferric chloride at the Landfill.

55. In July, 1984, a bulldozer at the Landfill crushed approximately 3 drums containing anhydrous ferric chloride.

56. In August, 1975, the City was put on notice by the Vermont Agency of Environmental Conservation that the General Electric Company and I.H. Weisner, Inc. were potential hazardous waste producers in the Burlington area.

57. In September, 1975, the City in turn notified the General Electric Company and I.H. Weisner, Inc. that they had been listed by the Vermont Agency of Environmental Conservation as potential disposers of hazardous waste.

58. The City made no investigation as to whether those companies had disposed of hazardous waste into its Landfill.

59. Since at least January, 1978, the City knew or should have known that hazardous wastes had been disposed of into the Landfill.

60. In September, 1978, the City was notified by the Vermont Agency of Environmental Conservation that new regulations relating to solid waste management had been developed and adopted, including special requirements for sanitary landfills.

61. The notification also informed the City that hazardous wastes may not be disposed of at sanitary landfills without a special certification for those waste materials.

62. Small quantity generated hazardous wastes were disposed of in the Landfill after November 19, 1980.

63. In December, 1979, the City applied to the State of Vermont for a permit, license, or registration to operate a solid waste facility or sanitary landfill.

64. In March, 1980, the State of Vermont denied the City's application for the operation of a sanitary landfill because of "the potential for greater impact of the landfill on ground and surface waters of the Burlington Intervale and the lack of substantial evidence that this impact would not be adverse."

65. In June, 1980, the Vermont Agency of Environmental Conservation informed the City that the major reason for rejecting its application for certification was the discharge of leachate of significant concentration and indeterminant quantity into the waters of the state.

66. In connection with the denial of certification of the Landfill as a sanitary landfill, the Secretary of the Vermont Agency of Environmental Conservation informed the City by letter dated June 23, 1980: "The water samples taken both by your engineers and by ourselves indicate that leachate which is being discharged through the culvert into the marsh and under the railroad grade is as concentrated as any we have seen in Vermont."

67. In that letter, the Secretary of the Vermont Agency of Environmental Conservation also informed the City: "We have looked only at several diagnostic parameters, but these few show clearly that very contaminated water is being discharged into the wetland directly downgradient from the landfill."

68. On January 28, 1982, the State of Vermont issued a Solid Waste Disposal Facility Certification to the City.

69. The Certification contemplated the construction and operation of a resource recovery facility.

70. The Certification was effective from January 30, 1982 through January 30, 1987.

71. The Landfill has not received a National Pollutant Discharge Elimination System permit or a permit from the State of Vermont to discharge toxic and hazardous pollutants into the wetland.

72. The Notification of Hazardous Waste Site form (submitted by the City to the EPA) is used by the EPA to locate hazardous waste sites which treated, stored, or disposed of hazardous waste in the past and at which hazardous waste is still present.

73. The City has not applied to the EPA for a permit to dispose of hazardous wastes in the Landfill.

74. The City has not received from either the EPA or the State of Vermont a permit to dispose of hazardous wastes.

75. The Landfill does not have interim status to dispose of hazardous wastes.

76. For land disposal facilities which had been granted interim status prior to November 8, 1984, interim status terminated on November 8, 1985.

77. Methane is a colorless, flammable gaseous hydrocarbon and a by-product of organic decomposition.

78. The Landfill generates methane gas.

79. Methane gas generally rises but may move in a horizontal direction when the surface of the ground is frozen.

80. In late 1984, the City installed approximately forty (40) methane gas monitoring wells at and beyond the Landfill.

81. The gas monitoring readings, taken prior to December 27, 1985, established that the flow of methane gas moved from the Landfill boundary toward Manhattan Drive.

82. Concentrations of explosive gas (methane) generated by the Landfill have exceeded the "lower explosive limit" (the lowest percent by volume of a mixture of explosive gases which will propagate a flame in air at 25°C and atmospheric pressure) for the gas at the Landfill boundary.

83. Tests taken from gas monitoring wells ("GMW") located beyond the Landfill boundary on other properties along Manhattan Drive but not on the Dague's property indicated the following:

a. GMW# 1—between May 7, 1985 and November 29, 1985 concentrations of methane found within GMW# 1 exceeded the lower explosive limit on 14 occasions;

b. GMW# 3—between February 22, 1985 and November 29, 1985 concentrations of methane found within GMW# 3 exceeded the lower explosive limit on 26 occasions;

c. GMW# 4—between November 8, 1985 and November 14, 1985 concentrations of methane found within GMW# 4 exceeded the lower explosive limit on 2 occasions;

d. GMW# 25—between March 21, 1985 and April 25, 1985 concentrations of methane found within GMW# 25 exceeded the lower explosive limit on 5 occasions;

e. GMW# 26—between March 28, 1985 and May 30, 1985 concentrations of methane found within GMW# 26 exceeded the lower explosive limit on 4 occasions;

f. GMW# 27—between March 21, 1985 and May 30, 1985 concentrations of methane found within GMW# 27 exceeded the lower explosive limit on 11 occasions;

g. GMW# 28—between March 21, 1985 and May 30, 1985 concentrations of methane found within GMW# 28 exceeded the lower explosive limit on 11 occasions;

h. GMW# 29—between March 21, 1985 and May 9, 1985 concentrations of methane found within GMW# 29 exceeded the lower explosive limit on 8 occasions;

i. GMW# 30—between March 21, 1985 and May 17, 1985 concentrations of methane found within GMW# 30 exceeded the lower explosive limit on 9 occasions;

j. GMW# 31—between March 28, 1985 and June 13, 1985 concentrations of methane found within GMW# 31 exceeded the lower explosive limit on 12 occasions;

k. GMW# 32—between March 21, 1985 and May 17, 1985 concentrations of methane found within GMW# 32 exceeded the lower explosive limit on 14 occasions;

l. GMW# 33—between March 21, 1985 and May 30, 1985 concentrations of methane found within GMW# 33 ex-

ceeded the lower explosive limit on 11 occasions;

m. GMW# 34—between March 21, 1985 and June 13, 1985 concentrations of methane found within GMW# 34 exceeded the lower explosive limit on 13 occasions;

n. GMW# 35—between March 21, 1985 and March 28, 1985 concentrations of methane found within GMW# 35 exceeded the lower explosive limit on 2 occasions;

o. GMW# 37—between March 21, 1985 and March 28, 1985 concentrations of methane found within GMW# 37 exceeded the lower explosive limit on 2 occasions;

p. GMW# 38—on March 28, 1985 concentrations of methane found within GMW# 38 exceeded the lower explosive limit;

84. Gas monitoring wells #'s 1, 35, 37 and 38 are all located near the top of the embankment at the Landfill boundary.

85. Methane gas has seeped into the basement of Betty Dague's residence.

86. Gas well readings taken by the City from gas wells located on the Dague's property at 272 Manhattan Drive between November, 1984 and August, 1985 show at least 829 separate readings above the lower explosive limit of methane gas (4 percent gas to air or greater).

87. The City installed methane monitoring equipment in Betty Dague's residence, including a noise alarm which is set to go off when gas levels reach twenty percent of the lower explosive level.

88. Over twenty monitoring wells have also been installed throughout the Dague's yard.

89. During 1985 several of the wells contained methane gas in explosive-level concentrations.

90. In the spring, 1985, the City dug a hole (approximately $40' \times 40' \times 30'$) in the Dague's back yard in search of a methane gas channel.

91. On December 27, 1985, during the construction of the City's gas ventilating system, the City installed temporary blowers on individual wells drilled in connection with the system which were operated until the system became fully operational.

92. Thereafter, from January 4 to January 10, 1986, some of the test wells, which previously showed positive gas readings, showed no gas.

93. The City has installed a gas ventilating system which is designed to prevent the migration of methane gas away from the Landfill.

94. The gas ventilating system was designed and installed for the purpose of preventing continuing methane gas migration at the Landfill.

95. The gas ventilating system is a series of 16 perforated wells along the eastern and northern rim of the Landfill connected to a continuously operating vacuum pump. The Landfill gases, including methane, are continually collected and burned for destruction.

96. Since the installation of the gas ventilating system, the test wells on the Dague's property and other properties located along Manhattan Drive, which previously had concentrations of gas in excess of the lower explosive limit, no longer do so.

97. From March, 1980, to January, 1982, the State of Vermont permitted the City to operate the Landfill without certification.

98. During 1980 and 1981, the City developed a plan for a trash-burning plant (a Resource Recovery Facility or "RRF").

99. The December 15, 1981 Assurance of Discontinuance required the City to cease the disposal of all refuse, with the exception of the residue from a planned resource recovery facility, at the Landfill as of July 1, 1984.

100. The agreement specifically allowed the City to petition the State for an extension of the July 1, 1984 closure date if the City were unable to construct the planned resource recovery facility.

101. The agreement also obligated the City to submit engineering plans providing for methane gas control and for ground and surface water monitoring.

102. In May, 1983, the Mayor of the City vetoed an aldermanic resolution authorizing the construction of the resource recovery facility.

103. The Mayor's veto was sustained in December, 1983.

104. After deciding not to proceed with the construction of a resource recovery facility, the City requested and was granted a "limited extended operational period" for the Landfill—an extension of the July 1, 1984 closure date of the Landfill.

105. This extension was granted by way of an amendment, executed on September 12, 1984, to the December 15, 1981 Assurance of Discontinuance.

106. The September 12, 1984 amendment to the December 15, 1981 Assurance of Discontinuance required the City to upgrade the Landfill to meet certification standards in accordance with engineering plans approved by the Vermont Agency of Environmental Conservation or discontinue the disposal of solid waste by January 2, 1985. Admit, ¶ 90.)

107. The September 12, 1984 amendment to the December 15, 1981 Assurance of Discontinuance also required the City to implement several operational controls immediately in order to minimize the adverse impact of the Landfill's operations.

108. The terms and conditions of the September 12, 1984 amendment superseded and pre-empted all the requirements of the December 15, 1981 Assurance of Discontinuance and the requirements of the Solid Waste Disposal Facility Certification issued to the City on January 28, 1982.

109. The City was again granted another extension by way of an amendment, executed on January 31, 1985, to the December 15, 1981 Assurance of Discontinuance, and to the amendment executed on September 12, 1984.

110. The January 31, 1985 amendment granted the City a three-year extension of the July 1, 1984 closure date for the Landfill.

111. The terms and conditions of the January 31, 1985 amendment supersede and pre-empt: all requirements of the December 15, 1981 Assurance of Discontinuance; all requirements of the September 12, 1984 amendment to the December 15, 1981 Assurance of Discontinuance and the requirements of the Solid Waste Disposal Facility Certification issued to the City on January 28, 1982 and is in lieu of conditional certification.

112. At various times, the City has violated conditions of the December 15, 1981 Assurance of Discontinuance and the two succeeding amendments thereto.

113. Since July, 1972 the City has on occasions failed to provide adequate daily cover and compaction at the Landfill.

114. Further, a leachate collection system and methane control system were not in operation by September 1, 1985 and December 2, 1985, respectively, as required by the January 31, 1985 amendment.

115. The December 15, 1981 Assurance of Discontinuance, and subsequent amendments to it, were signed by a judge of the Vermont Superior Court, and under state law constituted an order issued by a court, the violation of which could result in the imposition of civil penalties.

116. Condition (2) of the January 31, 1985 amendment, page 8, provides in part:

On or before January 1, 1987, the City shall submit a written notification to the Secretary [of the Vermont Agency of Environmental Conservation] which describes what long term disposal options the City intends to pursue. Depending upon the substance of this notification, the City shall take the following actions:

(a) If the City plans to utilize a certified sanitary landfill, then the Facility [the Landfill] shall be completely closed in accordance with the Regulations on or before January 1, 1988 ...;

or

(b) If the City plans to utilize a resource recovery facility, but not necessarily limited to incineration, then by January 1, 1988, the City shall make a commitment which is persuasive to the Agency to guarantee that this goal is attainable. By making this commitment, the City pledges to negotiate a guaranteed start up of operation for a resource recovery facility on or before January 1, 1990. By choosing this alternative, the City commits to closing out the remaining portion of the Landfill by January 1, 1990.

117. The City did not choose to utilize a resource recovery facility pursuant to Condition (2)(b) of the January 31, 1985 amendment.

118. On September 1, 1987, the City and Vermont Agency of Natural Resources (formerly known as the Vermont Agency of Environmental Conservation) entered into another amendment to the January 31, 1985 Assurance of Discontinuance.

119. The Findings of Fact of the September 1, 1987 amendment provide in part:

1. The City of Burlington has entered an agreement with H.A. Manosh, Incorporated for the purpose of assuming future solid waste disposal capacity at the Manosh landfill, a certified solid waste disposal facility, for the residents of Burlington. H.A. Manosh, Incorporated has entered a contractual agreement with the town of Stowe to dispose of wastes accepted at the Stowe municipal transfer station. . . .

3. Condition 13 of the Assurance of Discontinuance [dated January 31, 1985] between the city of Burlington and the Agency of Environmental Conservation (renamed Agency of Natural Resources by act of 1987 Vermont Legislature) limits disposal at the Burlington landfill to wastes generated within the limits of Burlington.

120. The Conditions, Requirements and Restrictions of the September 1, 1987 amendment provide:

1. The city of Burlington shall operate the Burlington landfill in accordance with the conditions of the Assurance of Discontinuance dated January 31, 1985 except as amended below.

2. Condition 13 of the Assurance of Discontinuance is revised to read:

The disposal of solid waste at the Facility [the Landfill] shall be limited to wastes generated within the limits of the city of Burlington and the town of Stowe.

121. The September 1, 1987 amendment to the January 31, 1985 Assurance of Discontinuance was entered upon the Court records as an order of the Chittenden Superior Court pursuant to 3 V.S.A. Section 2822 by Judge Mathew I. Katz on September 28, 1987.

122. The disposal of solid waste at the Landfill now includes wastes generated not only within the limits of the City of Burlington but also within the limits of the town of Stowe.

123. The Landfill was not completely closed on or before January 1, 1988 and is still accepting solid waste for disposal.

124. The City plans to convert the Landfill into a public park after close-out finally occurs.

125. The City was notified by a State of Vermont inspector in April, 1977 about the need to control windblown papers from the Landfill.

126. The Vermont Agency of Environmental Conservation notified the City by letter dated May 26, 1978 that it had "recently received a number of formal complaints about the operation [of the Landfill] in regard to daily cover and the odor of the Landfill."

127. In August, 1978, a State of Vermont inspector found inadequate cover of garbage at the Landfill.

128. In September, 1978, a State of Vermont inspector found inadequate cover of garbage at the Landfill.

129. In October and December, 1978, the City received letters directed to the Mayor of the City from the University of

Vermont Department of Geology indicating an explosive gas problem at the Landfill.

130. The City received inspection reports from the Vermont Agency of Environmental Conservation in October and November, 1979 which indicated unsatisfactory amounts of daily cover being used at the Landfill.

131. In January, 1981, the City was granted permission by the Vermont Agency of Environmental Conservation to landfill approximately 300 cubic yards of sewage sludge at the Landfill.

132. In March, April, June and August, 1981, Vermont Agency of Environmental Conservation inspectors claimed to have found repeated violations of lack of daily cover at the Landfill, and notified the City of such violations. The City received an "Application Review Report" from the Vermont Agency of Environmental Conservation dated December, 1981 in which problems with inadequate cover, rodents and methane gas migration were noted in the history of the Landfill.

133. In March, 1982, the City received an inspection report from the Vermont Agency of Environmental Conservation indicating unsatisfactory amounts of daily cover being used at the Landfill.

134. In April, 1982, the City informed the Vermont Agency of Environmental Conservation that it had entered into a new contract for cover material at the Landfill, and that previous problems relating to daily cover of garbage were due to the prior supplier's inability to provide cover material.

135. In May, 1982, a Vermont Agency of Environmental Conservation inspector claimed to have found several days of garbage left uncovered and spoke to the operator of the Landfill about the problem.

136. In July, 1982, the City received a complaint from Ernest Dague, Sr. that windblown dust and ashes from the Landfill were coming into his back yard, pool and screenhouse.

137. The Vermont Agency of Environmental Conservation investigated Ernest Dague's complaint regarding dust and ashes from the Landfill in July, 1982, and spoke with Mr. John Rasys, building inspector for the City about the problem.

138. On August 4, 1982, the Vermont Agency of Environmental Conservation contacted City Streets Department Superintendent James Ogden to discuss dust control at the Landfill.

139. In February, 1983, a Vermont Agency of Environmental Conservation inspector claimed to have found deficiencies in compaction and covering of garbage at the Landfill, and discussed these problems with Mr. Ogden.

140. Following the meeting in February, 1983 with the Vermont Agency of Environmental Conservation inspector, Mr. Ogden informed the inspector that he would take immediate action with regard to cover at the Landfill.

141. In March, 1983, a Vermont Agency of Environmental Conservation inspector claimed to have found inadequate compaction and cover of garbage at the Landfill.

142. On May 9, 1983, the City Board of Aldermen voted to send a letter to the City Street Commission expressing their displeasure with the continual unsatisfactory Landfill inspection reports from the Vermont Agency of Environmental Conservation and requesting action to correct the problems.

143. On June 21, 1983, Ernest Dague telephoned a complaint to the City that the Landfill was very dusty. The complaint form number 2016 indicates that the road was watered as a result of the complaint.

144. In July, 1984, the Vermont Agency of Environmental Conservation granted the City an extension to operate the Landfill on the condition that operational procedures be corrected.

145. In April, May, June, July and August, 1984, a Vermont Agency of Environmental Conservation inspector claimed to have found inadequate compaction and daily cover of garbage at the Landfill and informed the Landfill operator of the violations.

146. The subject of rodents, cover and compaction of cover garbage were also dis-

cussed at the August 15, 1984 meeting among Vermont Agency of Environmental Conservation and City officials.

147. On November 28, 1984, the City measured methane gas concentrations above the lower explosive limit around the houses at 256–258 Manhattan Drive.

148. As a result of the gas readings taken on November 28, 1984, additional gas wells were installed around the perimeter of the Landfill and the City began testing for methane regularly at the test wells sites.

149. On December 11, 1984, the City sent Ernest Dague, Jr. a letter regarding the levels of methane gas detected in and around his home at 272 Manhattan Drive.

150. In December, 1984, Vermont Agency of Environmental Conservation representatives met with Mr. Ogden to investigate methane gas generation at the Landfill and to inspect and supervise remedial actions taken by the City to vent methane gas away from Manhattan Drive properties.

151. The City regularly tested for methane gas along Manhattan Drive in December, 1984 and continued doing so until at least February, 1986.

152. On January 15, 1985, Messrs. Goodkind and Ogden, among others, met to discuss methane migration at the Landfill and sippage of the embankment above the Landfill.

153. In February, 1985, the City Solid Waste Task Force requested that the City Board of Aldermen place a $2.4 million bond issue for capital improvements at the Landfill on the March, 1985 ballot.

154. The $2.4 million bond issue was placed on the March, 1985 ballot, and was defeated by City voters.

155. On February 21, 1985, the City Board of Aldermen voted to lend a gas detection device to Ernest Dague, Jr. so that he could take readings for the presence of methane gas in his home.

156. On February 21, 1985 the City Board of Aldermen voted to refer to the City Board of Finance a proposal to pay $500.00 per month to Ernest Dague, Jr. and to Paul Robar as compensation for methane gas problems caused by the Landfill.

157. A site inspection at the Landfill on or about February 27, 1985, revealed that coal ash was being improperly disposed of at the Landfill. In particular, coal ash was being stock-piled along with other cover material, was being used to construct an access road in the Landfill, and was not being covered properly.

158. On March 18, 1985, the City Board of Finance voted unanimously to purchase a gas detection device for the use of Ernest Dague, Jr.

159. On April 3, 1985, Mr. Goodkind notified the Superintendent of the City Parks and Recreation Department that garbage dumped by the Parks Department during the weekend would often be left uncovered at the Landfill until Monday mornings.

160. In April, 1985, the City investigated an abandoned sewer overflow line to ascertain if it had been acting as a passageway for methane being generated in the Landfill.

161. In April, 1985, Mr. Ogden informed Ernest Dague, Jr. that a hole would need to be dug in his yard to locate a sewer overflow pipe which may have been acting as a conduit for Landfill gas.

162. The City agreed to indemnify the Dagues for damage which might be caused by the City's excavation and to restore their yard to its pre-excavation condition.

163. By letter dated April 23, 1985, the Vermont Agency of Environmental Conservation asserted that the City that methane gas generation from the Landfill was creating a nuisance and a risk of fire and explosion in and around the Landfill.

164. On April 23, 1984, the City was notified by a Vermont Agency of Environmental Conservation inspector that further cover material and compaction of garbage were needed at the Landfill.

165. In July, 1985, the City received a complaint from Donald Bessette that trees, shrubs and grass were dying on his mother's property at 310 Manhattan Drive.

482

166. In July, 1985, Paul Mattor, an employee of the City Health & Safety Department, investigated the complaint and found that methane gas migrating from the Landfill was entering the Bessette property at 310 Manhattan Drive and causing plant defoliation and death. Mr. Mattor also advised Mr. Bessette that he should postpone his plans to build on the embankment until the City had completed installation of its gas control system.

167. The City contracted with Abalene Pest Control which applied poisons for rodent control at the Landfill on April 19, August 2, and August 16, 1986.

Burlington, Vermont. 2 May 1989.

DOWNS RACHLIN & MARTIN
By: /s/ Richard N. Bland
Richard N. Bland
Attorneys for Plaintiffs
199 Main Street
P.O. Box 190
Burlington, VT 05402–0190
(802) 863–2375